# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DAVID A. SCHLEMM,

        Petitioner,

     v.                                 Case No. 05-C-0561

PHILLIP KINGSTON, Warden,

        Respondent.

## DECISION AND ORDER ON PETITION FOR A WRIT OF HABEAS CORPUS

### I.  FEDERAL PROCEDURAL BACKGROUND

On May 23, 2005, the petitioner, David A. Schlemm ("Schlemm"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On May 23, 2005, Schlemm also filed a motion to hold his habeas petition in abeyance while he exhausted certain claims in state court.  On October 28, 2005, the Honorable Charles N. Clevert, Jr., United States District Judge, to whom this case was originally randomly assigned, screened Schlemm's petition and directed  that Schlemm advise the court regarding the status of his sate court proceedings.

In response to the court's direction, on November 21, 2005, Schlemm filed, among other things, an amended petition for a writ of habeas corpus, a notice of election to withdraw his unexhausted claim, a notice of election to withdraw his motion for abeyance, and a motion for the appointment of counsel.  On March 2, 2006, Judge Clevert ordered that Schlemm's motion for abeyance be deemed withdrawn and that Schlemm's motion to withdraw his unexhausted claim be denied as moot, as Schlemm had filed an amended habeas petition.  Judge Clevert also denied

Schlemm's motion for appointment of counsel without prejudice and ordered the respondent to file an answer to Schlemm's amended petition. Subsequently, both of the parties consented to magistrate judge jurisdiction. Thereafter, on April 3, 2006, the respondent, Phillip Kingston ("Kingston"), filed his answer.

This court issued a schedule to govern the briefing of the petitioner's claims. That schedule was thereafter amended several times, at the request of the parties. The parties have now filed their briefs setting forth their respective positions on the petitioner's claims. For the reasons which follow, Schlemm's petition for a writ of habeas corpus will be denied and this action will be dismissed.

## II. STATE PROCEDURAL HISTORY

On April 9, 1999, a jury found David A. Schlemm guilty of one count each of substantial battery; kidnapping, by use or attempted use of force; and aggravated battery. The jury also convicted him of two counts of intimidation of a victim, by use or attempted use of force, and four counts of second-degree sexual assault, use of force, all in violation of Wis. Stats. §§ 940.19(2), 940.30(1)(b), 940.19(6), 940.45(1), and 940.255(2)(a). On May 11, 1999, the court imposed a sentence totaling 110 years imprisonment. A postconviction motion alleging ineffective assistance of counsel was filed and denied. Schlemm's appellate counsel filed with the Wisconsin Court of Appeals a no-merit report under Wis. Stat. Rule 809.32 and *Anders v. California*, 386 U.S. 738 (1967). Appellate counsel also filed an amended no-merit report in response to an order of the Wisconsin Court of Appeals. Schlemm filed a response to those reports, and appellate counsel filed a supplemental no-merit report to which Schlemm responded.

On October 30, 2003, the Wisconsin Court of Appeals affirmed Schlemm's judgment of conviction and the denial of his postconviction motion. On February 24, 2004, the Wisconsin

Supreme Court denied Schlemm's petition for review. As previously stated, on May 23, 2005, Schlemm filed his federal habeas corpus petition.

### III. FACTUAL BACKGROUND

In its decision, the Wisconsin Court of Appeals set forth the facts in this case to be as follows.

At trial, Kathleen P.[1] testified as follows. She met Schlemm in July 1998. They became friends and soon began a sexual relationship. Kathleen described Schlemm as "very polite" and "classy." Schlemm "complimented" her, gave her "a lot of attention," and made her "feel good." In early September, Schlemm began telling Kathleen not to look at people as they walked by because she was "his woman and he wasn't going to share" her with others. Kathleen felt "very uncomfortable" about Schlemm's actions.

On September 8, Kathleen was making "small talk" with one of Schlemm's neighbors outside his residence. When he saw this, Schlemm "came up running" to Kathleen and hit her in the face with a closed fist. He pulled her into the house and "punched" Kathleen in the stomach. He then dragged Kathleen into the basement. At first, she did not think that she was seriously hurt but, on the next day, the pain was "excruciating." When Kathleen told Schlemm that she needed to see a doctor, he refused to let her go until she agreed to say that she had been jumped by three girls in an alley. Schlemm was "afraid the police would come and he would be arrested" and Kathleen agreed to lie because she was afraid of him and so that he would let her go. Schlemm also told Kathleen that if she did not lie and he were incarcerated, he would not "take kindly to that" – a remark that Kathleen felt was a threat. Kathleen eventually went to the hospital on September 11, and she was found to have two broken ribs.

Kathleen testified that she had loaned her rent money to Schlemm, and despite his assurances that he was starting a job shortly, he was not paying her back. A few days after she was treated for the broken ribs, Kathleen voluntarily spent three days in the hospital for "depression and alcohol." Kathleen testified she "was concerned about [her] drinking" and felt that a "pattern of abuse and battery" may be starting with Schlemm. Before she met Schlemm, she was not abusing alcohol or using drugs, but that she had started using them to feel "numb." She also testified that she was beginning to think that Schlemm was lying to her and that things were "getting out of control."

---

[1] The state court of appeals' decision refers to the victim as "Kathleen P.", but the parties' briefs in this case both refer to her by her last name, Pooler. Thus, the victim will be referred to in this decision as either "Kathleen" or "Pooler."

3

After her release from the hospital on Monday September 21, Kathleen went to a friend's house because she had no other place to go. Schlemm stopped in while she was there. Schlemm seemed "very happy" to see Kathleen and told her that he "missed" her. Schlemm left and returned with a rose for Kathleen, and he was acting like he did "in the beginning." When Schlemm "wanted to talk about the relationship," Kathleen agreed to go to his house and talk. Kathleen testified that she "knew . . . [that] once abuse starts, it just doesn't go away," but she thought Schlemm was "sincere." As they walked to Schlemm's house, he was "affectionate" and held her hand.

Kathleen testified that when they arrived at Schlemm's house, he "slammed the door, and . . . just started punching the hell out of me." Schlemm told Kathleen that she "deserved to be hurt" because she had stopped at a former boyfriend's house earlier that day and done some cleaning to earn $20. Schlemm accused Kathleen of having sex with the person. Kathleen testified that Schlemm punched her in the stomach and kicked her several times in the head while she was on the floor. Kathleen testified that she was crying and laid down on a mattress because she was "in so much pain." Eventually, Schlemm "started forcing himself sexually" on Kathleen, despite her requests that he stop. Kathleen acknowledged that she may have consented on the first day, but that she told Schlemm she was "in too much pain" on the second day. Schlemm then "quit listening" and told Kathleen that she was "his woman," and "had to do what he wanted" and that she "would learn to like it." Kathleen testified that she was "in so much pain" that she just laid on the mattress and cried herself to sleep.

Kathleen said that she tried to leave, but when she would try, Schlemm would "catch" her, beat her, and pull her back into the basement. On one occasion, Schlemm put Kathleen's tote bag near the door and suggested to her that she leave. When Kathleen picked up the bag, Schlemm "came behind" her, "started hitting on [her] a lot of times," and dragged her back downstairs. She acknowledged drinking and using cocaine with Schlemm because she "didn't want to get him angry" and "to numb the physical pain." Kathleen testified that she "always wanted to leave" but Schlemm "would not let me leave and . . . would beat the shit out of me if I tried to leave." When Schlemm left the house, he would take Kathleen's clothes with him, and Kathleen said she was "terrified" that Schlemm might see her if she tried to leave. Kathleen said she tried to call 911, but that Schlemm then "ripped [the telephone] out of the wall." Kathleen testified that in addition to forced penis-vaginal intercourse and penis-oral contact, Schlemm twice put his penis forcibly in her anus. Toward the end of the week, Schlemm also forcibly put a broom handle into Kathleen's vagina.

Kathleen testified that occasionally she left the house with Schlemm. They went to a restaurant once and to get cocaine twice. She did not try to leave because

Case 2:05-cv-00561-WEC   Filed 07/19/07   Page 4 of 28   Document 49

of Schlemm's anger. On one occasion outside the house, Schlemm was slapping her and she ran into the middle of the street to get away. A "big guy" restrained Schlemm and the police came. She felt "this was my chance to be able to . . . tell them what was going on," but when an officer told her that Schlemm "had no warrants" and they "could not hold" him, she "clammed up." Kathleen testified that she was at Schlemm's house for several days before she was able to escape on Thursday, September 26, while Schlemm was asleep. She called her mother from a nearby pay phone. Her mother picked up Kathleen and took her to the hospital.

On cross-examination, Kathleen admitted she received a citation from police for running into the road and that she did not ask the officers for help. Kathleen denied trying to open the door of the squad where Schlemm was being questioned. She admitted being at Schlemm's house on September 17, seeing one of his ex-girlfriends, and being told that Schlemm was cheating on her.

Prior to Kathleen's testimony, the State presented Carmen Pitre, the coordinator of the Milwaukee Commission of Domestic Violence and Sexual Assault. Pitre was qualified as an expert and testified about the various phases of a violent relationship – the "honeymoon" period when a "significant connection" is made between the victim and the batterer; the "attention-building" period when emotional and verbal abuse begins, the victim becomes increasingly isolated, and "believes something is going to happen [but] can't quite put her finger on it"; and the violent phase, when the batterer begins to physically injure the victim. Pitre also described the various reasons why a victim might not accept assistance from the police if they were accessible. Pitre testified that she had never counseled Kathleen. On cross-examination, Pitre described the various training given to police officers so that they are better able to identify domestic violence situations.

Medical records from the September 11 hospital visit showed that Kathleen had two broken ribs. Medical records from the September 26 hospital visit reflected multiple bruises to virtually every part of Kathleen's body. An analyst from the State Crime Laboratory testified that traces of Schlemm's DNA and Kathleen's epithelial tissue were found on a broom handle recovered from the basement of Schlemm's house.

## IV. HABEAS CORPUS STANDARD OF REVIEW

Federal courts may issue a writ of habeas corpus if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Moffat v. Gilmore*, 113 F.3d 698, 702 (7th Cir. 1997); *see also Del Vecchio v. Illinois Dept.*

*of Corrs.*, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc) ("'[F]ederal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law.'") (quoting *Hass v. Abrahamson*, 910 F.2d 384, 389 (7th Cir. 1990)).

The habeas corpus statute was amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104-132, 100 Stat. 1214, which provides, in pertinent part, that the federal courts may not grant habeas relief under Section 2254 unless the state court's judgment

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "A rule is 'clearly established' only if it is compelled by existing Supreme Court precedent." *Henry v. Page*, 223 F.3d 477, 480 (7th Cir. 2000) (quoting *Hogan v. Hanks*, 97 F.3d 189, 192 (7th Cir. 1996)). A federal habeas court may not rely on its own precedent or that of circuit courts of appeals. There must be Supreme Court precedent to support the petitioner's claim and that Supreme Court precedent must have clearly established the relevant legal principle as of the time of the petitioner's direct appeal. *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999).

A state court decision results in an "unreasonable application" of clearly established federal law when that court either (1) "identifies the correct governing legal rule from [Supreme Court precedent] but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see also Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004). However, a federal habeas court may not grant relief under the "unreasonable

6

application" prong unless the state court's application of Supreme Court precedent "l[ies] well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). A state court decision "minimally consistent with the facts and circumstances of the case" is not unreasonable. *Connor v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004) (internal quotation omitted).

Issues of fact found by a state court are presumed to be correct unless the petitioner rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Williams v. Parke*, 133 F.3d 971, 973 (7th Cir. 1997).

The AEDPA's deferential standard of review only applies where a state court has adjudicated a petitioner's claim on the merits. *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005); *Braun v. Powell*, 227 F.3d 908, 916 (7th Cir. 2000). Where there is no state court decision on the merits, a federal habeas court applies the standard of 28 U.S.C. § 2243, and disposes of the petitioner's claim "as justice and law require." *Braun*, 227 F.3d at 917.

That having been said, before a federal court may review the merits of a habeas petition, a petitioner must: (1) exhaust all remedies available in state courts and (2) fairly present any federal claims in state court first, or risk procedural default. *See Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001) ("Failure to exhaust available state court remedies constitutes a procedural default."); *see also Bocian v. Godinez*, 101 F.3d 465, 468 (7th Cir. 1996) (same). "The habeas petitioner must present his federal constitutional claims initially to the state courts in order to give the state 'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *McGowan v. Miller*, 109 F.3d 1168, 1172 (7th Cir. 1997) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)) (internal quotations omitted). This means that "state prisoners must give the state courts

7

one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Although interrelated, courts have discussed exhaustion of state remedies and procedural default as separate issues.

A petitioner has exhausted his state court remedies "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing a review of one's conviction in state court." *Wallace v. Duckworth*, 778 F.2d 1215, 1219 (7th Cir. 1985).

The procedural default hurdle forbids the federal courts from addressing claims that were not fairly presented to the state court. *Jones v. Washington*, 15 F.3d 671, 675 (7th Cir. 1994). Procedural default occurs either when a state court has declined to address a federal claim because the petitioner failed to satisfy an independent state procedural requirement, *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991), or when the petitioner fails to present a claim to the state courts at the time, and in the way, required by the state. *Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996).

Under the doctrine of procedural default, a federal habeas court will not review defaulted claims unless the petitioner demonstrates either (1) cause for the procedural default and actual prejudice resulting from the alleged violation of federal law, or (2) that failure to consider the claims would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749-50 (quoting *Murray v. Carrier*, 477 U.S. 478, 495 (1986)). The petitioner bears the burden of establishing that his procedural default is excused by one of these two exceptions. *See McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991).

To satisfy the cause and prejudice standard, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488. The petitioner must also show that the errors of which he complains "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original). To demonstrate that a fundamental miscarriage of justice would result from a refusal to consider the defaulted claims, the petitioner is required to show that he is "'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (quoting *Murray*, 477 U.S. at 496). "This standard requires a petitioner to show that it is more likely than not that no reasonable juror would have convicted him." *Rodriguez v. Scillia*, 193 F.3d 913, 917 (7th Cir. 1999).

## V. DISCUSSION

Schlemm asserts a number of claims in support of his federal habeas petition. All but one of them can be placed under the umbrella of ineffective assistance of counsel. Schlemm argues that his trial counsel was constitutionally ineffective for: (1) not calling Robert Rix and Julie Rodriguez as witnesses after telling the jury in his opening statement that he would do so; (2) failing to "investigate and interview witnesses," specifically: (a) failing to investigate the phone call that Kathleen made to her mother; (b) failing to call Julie Rodriguez, Robert Rix, and Robert Hansen as witnesses at trial; (c) not investigating and presenting an expert witness to rebut the State's expert, Carmen Pitre; (d) not having the DNA evidence found on the broom handle tested and inadequately cross-examining the State's expert DNA witnesses; and (e) not obtaining Kathleen's mental health records so that he could fully cross-examine her about her mental history and its effect on her ability to recall Schlemm's abuse. Finally, Schlemm claims that he was unconstitutionally denied his right

of self-representation when the trial court refused to allow him to fire his trial counsel on the second day of trial.

## A. Ineffective Assistance of Counsel

Defendants in criminal cases have a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 , 686 (1984). In order to establish an ineffective assistance of counsel claim, a defendant must demonstrate both that counsel's assistance was ineffective, and that the ineffective assistance prejudiced the defendant. A defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The burden on a habeas petitioner to show that counsel's assistance was ineffective is not easily satisfied. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Furthermore, a habeas court need not address the two prongs of *Strickland* in any particular order or even address both if the defendant makes an inadequate showing as to one. In this latter regard the Supreme Court in *Strickland* stated:

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court

10

need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697.

In deciding Schlemm's ineffective assistance claims the Wisconsin Court of Appeals applied the two pronged test of *Strickland*. That is to say, the court of appeals identified the correct governing legal rule from the Supreme Court. Thus, the only question for this court to decide is whether the state court unreasonably applied *Strickland* to the facts in Schlemm's case.

*(1) Counsel's failure to call Robert Rix and Julie Rodriguez as witnesses after telling the jury in his opening statement that he would do so*

Schlemm argues that his trial counsel was ineffective for failing to call two witnesses, Robert Rix and Julie Rodriguez, after telling the jury in his opening statement that he would be calling them. Specifically, counsel stated:

> First and foremost, during that time, Miss Pooler was free to come and go as she pleased. And a fellow named Robert Rix will testify to that. And a young lady named Julie Rodriguez will testify to that. At one point, Miss Rodriguez was in the house, Miss Pooler came over, and Mr. Schlemm said Miss Rodriguez, you better get out of here because Miss Pooler is not going to be happy to see you here.

(Ans., Ex. EE:63).

To be sure, counsel did not call either of those witnesses. During the trial, counsel advised the court why he had elected to not call Miss Rodriguez as a witness.

> Your Honor, this is for the purposes of the record and for my client not having been able to speak with him. Julie Rodriguez was brought down by the good officers of the Milwaukee County Sheriff's Department. I spoke with her both on Saturday night in the jail and in the jury box. Her testimony was going to confirm a letter she wrote on behalf of David Schlemm and her personal observations of the victim during the entire month in question.

11

However, upon further voir dire we'll call it, further questioning informally, she stated if she took the witness stand she would have to in essence be available for any questions that were to come either on direct or cross-examination. She confirmed that she had suffered some physical abuse at the hands of David Schlemm, and that is the reason that we have withdrawn her from our witness list.

I didn't get to come back and tell you that because the jury door was open, so I hope that makes the record regarding that matter.

(Ans., Ex. HH: 53-54). Nothing in the record indicates why counsel chose not to call Rix as a witness.

In its decision, the court of appeals did not speak directly to this claim. Instead, this claim (along with others) was generally addressed in the court's fifth footnote which reads, "In his responses, Schlemm includes a 'laundry list' of twenty-nine instances when his trial counsel was allegedly ineffective. We do not address every allegation, and any contention not specifically discussed has been considered by this court and rejected." (Ans., Ex. N: 8.) Schlemm argues that the court of appeals decision does not constitute an "adjudication on the merits" of all of his ineffective assistance of counsel claims. Thus, it is necessary to determine what "adjudication on the merits" means in the context of AEDPA.

In *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005), the Seventh Circuit Court of Appeals discussed what "adjudication on the merits" means for the purposes of § 2254(d), holding that "adjudication on the merits" does not require "a well-articulated or even a correct decision by a state court." *Id*. Rather, "adjudication on the merits" requires "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Id.* (internal quotations omitted). Although the court of appeals' decision did not directly address each and every claim of ineffective assistance of counsel raised by

12

Schlemm, its decision was indeed an "adjudication on the merits" as it was clearly a "decision finally resolving the parties' claims, with res judicata effect," and was "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Muth*, 412 F.3d at 815; *see also Weeks v. Angelone*, 528 U.S. 225, 237 (2000) (rejecting a claim, under the deference rules set forth in AEDPA, that was rejected without explanation by the Virginia Supreme Court, and thus, implicitly treating a summary disposition of a claim by a state court as an adjudication on the merits). And, where a state court does not provide specific reasons for disposing of certain claims in its decision, "federal courts are obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). This independent review, however, "is not a full, de novo review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Id.*

Turning then to Schlemm's claim, I am not persuaded that Schlemm was deprived of his constitutional right to effective assistance of counsel by virtue of his counsel's failure to call either Rodriguez or Rix as witnesses after telling the jury that he would be calling them. Simply put, I am not satisfied that he was prejudiced by such failure. The jury heard that Kathleen had several opportunities to escape from Schlemm. The jury just did not hear such evidence from the mouths of Rodriguez or Rix. The jury also heard evidence relating to the incident involving Rodriguez which counsel referenced in his opening statement. Specifically, during her testimony, Kathleen related to the jury that she was aware of the fact that Schlemm was cheating on her, and that she knew Schlemm had snuck Rodriguez out of his home as Kathleen was entering. (Ans., Ex. GG: 39-

13

41.)   The bottom line is that, while trial counsel should probably not have told the jury that it was going to learn of certain evidence through Rodriguez and Rix, the jury did learn of that same evidence, except by way of different witnesses.  Such being the case, Schlemm was not prejudiced by trial counsel's opening statement.  Stated another way, Schlemm has not shown that "there is a reasonable probability that, but for counsel's [opening statement], the result of the proceeding would have been different."  *Strickland,* 466 U.S. at 694.

*(2) Counsel's failure to "investigate and interview witnesses"*

Schlemm argues that his trial counsel was ineffective for failing to properly investigate and for failing to interview witnesses.  Because of such failure, Schlemm asserts that his counsel was unprepared to present an effective defense.  His general claim is supported by several specific examples, which will be addressed separately below.

*(a) Counsel's failure to investigate the phone call that Kathleen made to her mother*

Schlemm argues that counsel was ineffective for failing to investigate the "alleged phone call to [Kathleen's] Mother situation." (Pet'r's Br. at 11.)  More precisely, Schlemm argues that his counsel should have done more to demonstrate the unlikelihood (if not impossibility) of Kathleen's being able to get ahold of her mother in the manner in which she testified.

According to Schlemm,

the amassed evidence easily permits a reasonable inference that an undisclosed deal between Pooler and her [m]other, indeed, probably more than one deal, was made between Pooler and her [m]other to plant evidence against Schlemm.  The evidence that there was a bargain struck between Pooler and her [m]other is three-pronged:  First, Pooler picked at random from all other places in Milwaukee area where her [m]other could have been reached.  Second, Pooler's random act of reaching her mother at all was practically zero, since the full record on this phone call incident shows that Pooler could not have known where her [m]other was, thus a plausible inference the phone call was staged from the onset.  Third, the random probability

14

that Pooler just happened to know of her [m]other's precise location at the time of the underlying phone call, presents more statistically uncertainty than the transposed probability that the two of them got together because they conspired to frame Schlemm by putting together a convincing story to support Pooler's other contrived allegations of the supposed crime. Thus, evidence along these lines would have bolstered the theory that Schlemm was innocent and that the state was using perjured testimony and deliberately fabricated evidence to convict Schlemm.

(Pet'r's Br. at 12-13.) In other words, Schlemm faults his trial counsel for not better attempting to show that Kathleen and her mother lied when they testified that Kathleen called her mother from a pay phone on September 26. The evidence was that Pooler called her mother while her mother was at a friend's house. Schlemm argues that there is no way that Pooler would have known that her mother was at a friend's house and therefore Pooler and her mother must have conspired to frame him. If his counsel would have obtained the records of such phone call (or, more precisely, demonstrated the absence of such records), it would have shown Pooler and her mother to be liars.

Simply stated, Schlemm's argument is nothing more than speculation. He has not demonstrated with any specificity what the phone records would reveal (or not reveal); nor has he demonstrated why it would be unreasonable for Pooler to know enough to attempt to get in touch with her mother at the friend's house. Such being the case, he has clearly not shown how he was prejudiced by his counsel's failure to obtain the phone records.

*(b) Counsel's failure to call Julie Rodriguez, Robert Rix and Robert Hansen as witnesses at trial*

Schlemm argues that trial counsel was ineffective for not calling Julie Rodriguez, Robert Rix and Robert Hansen as trial witnesses. According to Schlemm, if Rodriguez had been called to testify, she would have testified that "Schlemm was *not* an abusive person at all, including that on September 17, 1998, Pooler caught Schlemm with Rodriguez, at which time Pooler exploded with rage that compelled Rodriguez to slip out a side-door of the residence the parties were at in order to

15

avoid any confrontation from Pooler." (Pet'r's Br. at 14.)  According to Schlemm, Rix would have testified that "he (Rix) was at the Schlemm residence on September 26, that he (Rix) and Schlemm then left the residence together around 6:00 A.M. that morning, leaving Pooler all alone at the residence and 'escape' (if she truly wanted to)." (Pet'r's Br. at 15.)  Again, according to Schlemm, if Robert Hansen had been called to testify,

> [his] testimony would have established that Pooler was lying when she testified that she did not sell her microwave and son's TV for crack cocaine on September 16, 1998.  At trial, Pooler was asked by [defense counsel] if she in fact sold her microwave and son's TV for crank [sic] cocaine, she answered 'no'.  Yet, Hanson makes clear in his affidavit that on September 16, 1998, Pooler *did* in fact sell her microwave and son's TV so that the three of them could obtain more drugs.  Further, Hansen's affidavit corroborates the defense that Pooler was implicating Schlemm because he allegedly cheated on her with Rodriguez.

(Pet'r's Br. at 14-15.) (citations to record omitted)

Schlemm acknowledges that the jury heard evidence that Pooler was motivated to testify falsely against Schlemm because he was cheating on her with Rodriguez.  He argues, however, that "testimony by Hansen (*and* Rodriguez) would have *bolstered* rather than detract from Schlemm's claim of innocence by negating the inferences raised by Pooler's testimony that Schlemm was this over[ly] jealous and possessive person." (Pet'r's Br. at 15.)

Schlemm also acknowledges that "the jury heard evidence that Rix's proffered account here is in fact true via police and Schlemm's testimony at trial as to the time in which they were stopped by police on the morning of September 26." Pet'r's Br. at 15.)  However, once again he argues that "testimony by Rix would have again *bolstered* rather than detract[ed] from a defense of innocence by negating the alleged events raised by Pooler's testimony that she was being held against her will by Schlemm on the September 21 to September 26, 1998 events." (Pet'r's Br. at 15-16.)

16

To be sure, Schlemm attached to his amended petition various letters and affidavits that are purportedly signed by Rodriguez, Rix, and Hansen. In her affidavit Rodriguez states, *inter alia*, that

> [d]uring the 4 to 5 years that I have known Mr. David A. Schlemm, I have never been abused or assaulted or harmed by Mr. Schlemm, at any time during the years that I have known him. I have never informed attorney, David Bordow, or assistant District Attorney, Gail Shelton, that Mr. Schlemm broke my finger or abused me in any way, shape, or form.

(Amend. Pet., App. E.) However, the record belies Ms. Rodriguez's statement. Specifically, at Schlemm's sentencing, Assistant District Attorney Gail Shelton presented to the court a history of Schlemm's violent acts against women. In that connection she stated, in part, as follows.

> A warrant was outstanding for a period of two months, from May until July of 1997, and when the defendant was arrested on that warrant, he was released on a personal recognizance bond on July 23rd. The very next day, July 24, 1997, he committed another act of violence against another woman who he was seeing named Julie Ann Rodriguez. Now Julie Ann Rodriguez is the witness who the defense had brought down to this courtroom during the jury that we did last month and had indicated that he was going to call her as a witness on his behalf. Instead the parties talked to Ms. Rodriguez when she came and learned that Ms. Rodriguez was also one of the defendant's numerous female victims of his brutality.

> In the case issued for the offenses on July 24, 1997, in Case No. 97-CM-009449, the defendant was charged with battery and habitual criminality. Ms. Rodriguez reported that she was asleep and awakened to find the defendant who she was involved in a domestic relationship with beating her. Beating her both with a rifle and then with an iron. She fled sustaining injuries including black eyes, facial cuts, bruises. In addition to the physical acts, the defendant made threats against her to dowse her with gasoline and burn her. She reported to the police that she had suffered numerous acts of abuse at the hands of the defendant, including just the previous day, the day that the defendant was released on P.R. bail from the violation of domestic abuse injunction involving the Bushberger family. She reported that she had sustained damage to her eyes that required her to wear special glasses. She had to have stitches to her face above her eye.

> When we spoke to her last month when she was brought down her[e], the defense ultimately decided not to call Ms. Rodriguez. She indicated that she – and showed us that she still had scars on her face from the stitches from the blows that the defendant had struck against her, that he had beat her frequently, that he had broken

17

her finger. The police reports reflect that when they came to investigate[] this matter, that they observed numerous injuries on her body.

A warrant was outstanding on that case until late August, so for a period of about a month, and unfortunately when that case came to trial about a month and a half after that, Ms. Rodriguez didn't appear in court and consequently that case was dismissed and the defendant was released.

Three weeks later, on October 23, 1997, which was the day that the defendant was due back in court on the violation of domestic abuse injunction case involving the Bushberger family from May of '97, instead of going to court that day, the defendant attacked Julie Rodriguez again, castigating her for having put him in jail for the previous month and a half for his beating of her. He threatened her and told her that he was going to punish her for this. He was extremely verbally abusive to her. He told her that when – he said when I get out this time, bitch, I'm gonna finish the job. He repeatedly struck her, smashed her head repeatedly into the wall, and repeatedly threatening to kill her. When the police arrived and were able to take him into custody, he was extremely abusive to them both verbally and physically.

(Ans. Ex. JJ, at 16-19.) In the face of formal charges having been brought against Schlemm based on Rodriguez's complaints to the police, it defies understanding how Schlemm can think any reasonable jury would have believed Rodriguez if she had testified to the facts set forth in her affidavit. Indeed, if Rodriguez had been called as a witness, on cross-examination she would have been used by the prosecution to figuratively "bury" Schlemm. Simply stated, he was not prejudiced by his counsel's decision to not call Rodriguez as a witness.

Similarly, Schlemm was not prejudiced by his counsel's failure to call Rix as a witness. Even assuming that Rix had been called and had testified in the fashion set forth above, it cannot be said that "there is a reasonable probability that [if the jury had heard such testimony] the result of the proceeding would have been different." *Strickland,* at 694. To the contrary, the jury did hear evidence that Pooler had opportunities to "escape." They just also happened to hear Pooler's testimony that she was afraid to do so, testimony which the jury obviously chose to believe.

18

Finally, Schlemm presented with his amended petition an affidavit dated June 10, 1999, which was purportedly signed by Hansen. That affidavit reads as follows:

> I Robert Hanson would like to state on September 16th 1998 I went over to David Schlemm's residence at 2322 S. 8th St and seen David with ex-girlfriend Julie Rodriguez. Then later on that day I ran into Kathleen Pooler on 13th St. at which time I told Kathy that David was with his ex-girlfriend Julie. Kathy was pissed. Then me and a friend took Kathy to her house on 14th St where we smoked crack then Kathy wanted more so we sold her microwave and her son's T.V. for crack and beer and vodka and part[i]ed at her house witch [sic] we spent the night me and Kathy had sexual intercourse at her house on 14th. In the morning we dropped her off by David's house on 8th St. I ran into Kathleen Pooler on the street and she told me the reason she put David in jail was because he cheated on me with Julie and that he kicked me out of his house and said he was going back to Julie.

(Amend. Pet., App. F.) However, during his trial testimony Schlemm testified that Hansen was "deceased." (Ans. Ex. II, at 24.) If Schlemm thought Hansen was deceased, it defies understanding how his trial counsel could have been constitutionally ineffective for not attempting to subpoena Hansen. But, even assuming that trial counsel should somehow have been able to divine that Hansen was alive, despite Schlemm's belief to the contrary, the fact remains that the court of appeals found that Schlemm was not prejudiced by the failure to call Hansen as a witness.

> In his postconviction motion, Schlemm asserted that Hansen would have testified that Kathleen was jealous of Schlemm's relationship with a former girlfriend and she was lying to get back at Schlemm. The jury heard other evidence that suggested Kathleen could have been motivated by jealousy. The failure to present Hansen would not have altered that outcome of the trial.

(Ans. Ex. P, at 10.) As stated previously, in order to be granted federal habeas relief, a petitioner must demonstrate that the state court's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Simply stated, it is my opinion that the court of appeal's judgment on this point was not an unreasonable application of *Strickland*.

19

*(c) Counsel's failure to investigate and present an expert witness to rebut Carmen Pitre*

As previously stated, the state called a witness, Carmen Pitre, as an expert in domestic violence. The court of appeals described her testimony as follows:

> Prior to Kathleen's testimony, the State presented Carmen Pitre, the coordinator of the Milwaukee Commission of Domestic Violence and Sexual Assault. Pitre was qualified as an expert and testified about the various phases of a violent relationship – the "honeymoon" period when a "significant connection" is made between the victim and the batterer; the "attention-building" period when emotional and verbal abuse begins, the victim becomes increasingly isolated, and "believes something is going to happen [but] can't quite put her finger on it"; and the violent phase, when the batterer begins to physically injure the victim. Pitre also described the various reasons why a victim might not accept assistance from the police if they were accessible. Pitre testified that she had never counseled Kathleen. On cross-examination, Pitre described the various training given to police officers so that they are better able to identify domestic violence situations.

(Ans. Ex. JJ, at 7)

Schlemm argues that his trial counsel was ineffective for not investigating the possibility of calling, and then calling, a witness to rebut the state's domestic violence "expert," Carmen Pitre. According to Schlemm, his trial counsel "did not become apprised that Pitre was going to be an expert witness for the state *until the time of the actual trial*. . . . [Thus, trial counsel] could not have had sufficient time to do the required analysis or review of the state's *Daubert* report to determine whether or not any rebuttal expert witness was in fact needed for the defense." (Pet'r's Br. at 16.)

Schlemm's argument must be rejected at the outset. As the court of appeals noted when addressing the same argument, "Schlemm does not indicate how a rebuttal expert would have changed the outcome of the trial." (Ans. Ex. JJ at 11.) He likewise fails to make such a showing in support of his habeas petition.

20

To be sure, Schlemm tries to do so in both his initial brief and his reply brief. In his initial brief, he argues that a rebuttal expert "could have knocked out the state's cycle of violence theory or at least preclude any negative inferences the state was able to draw from Pitre's testimony." (Pet'r's Br. at 25.) He also argues that it is

> likely that his expert witness would have testified that different parameters established cycles of domestic violence than what Pitre testified [and that her] theory was faulty, insofar as it was not possible to say with certainty that the above-listed encounters were the cause of cycle of domestic violence and that it did not occur here. For example, Schlemm's expert could have argued Pooler might have been suffering from some other trauma and be diagnosed falsely as suffering from the battered woman syndrome.

(Pet'r's Br. at 25.)

First of all, Schlemm has not identified any particular expert who was available to testify at trial to rebut Pitre. Nor has he identified any scholarly articles or other documentation to support a theory to which an expert could testify in rebuttal of Pitre. Thus, Schlemm's claim that his counsel was ineffective for failing to call an expert is founded on nothing but speculation. And speculation does not prove prejudice. Furthermore, Pitre did not testify that Pooler suffered from battered woman syndrome. Indeed, Pitre did not even personally examine Pooler. Instead, the sole purpose of Pitre's testimony was to generally acquaint the jury with the dynamics of domestic abuse so that they might consider the same in assessing Pooler's credibility.

Schlemm makes one last-ditch effort in his reply brief to show how he was prejudiced by counsel's failure to call an expert to rebut Pitre's testimony. Once again, however, he fails in his attempt to do so. Relying on *State v. Richard A.P.*, 223 Wis. 2d 777, 589 N.W.2d 674 (Ct. App. 1998), he asserts that

21

> [trial counsel] could have introduced evidence of [Schlemm's] character through the testimony of either cross-examining Pitre or independently hire a psychologist who could have evaluated [Schlemm] and concluded that [Schlemm's] history and his responses to specific testing about his allege[d] sexual or aggressive behavior did not show any evidence of any diagnosable sexual or aggressive disorder. Pitre or a retained defense psychologist could additionally have testified that absent such disorder, it is unlikely that David did the things that Pooler said he did to her.

(Reply at 8.)

First of all, Schlemm has not identified any expert or any written materials that would support the proposition that Schlemm's "history and his responses to specific testing about his allege[d] sexual or aggressive behavior did not show any evidence of any diagnosable sexual or aggressive behavior . . . [and that] absent such disorder, it is unlikely that [Schlemm] did the things that Pooler said he did to her." Furthermore, whether such evidence would even have been deemed admissible is debatable. *See State v. Walters*, 269 Wis. 2d. 142, 155, 675 N.W.2d 778, 784 (2004) ("*Richard A.P.* evidence, like other expert evidence, is subject to the requirements of the rules governing the admissibility of evidence. These include not only the rules governing character evidence and expert testimony, but also Wis. Stat. § 904.03, the rule governing the exclusion of otherwise relevant evidence."). In other words, Schlemm's argument is predicated entirely on speculation and conjecture. Such being the case, Schlemm has, simply stated, failed to show how he was prejudiced by trial counsel's failure to obtain and present expert testimony to rebut that of Carmen Pitre.

*(d) Counsel's failure to have the DNA evidence found on the broom handle tested and failure to adequately cross-examine the State's expert DNA witnesses*

Schlemm argues that his trial counsel was ineffective for not having the DNA evidence found on the broom handle tested and for inadequately cross-examining the State's expert DNA witness. Specifically, Schlemm asserts that

[i]f the jury had heard some credible attack against the DNA analysis, it would have had reason to doubt the state's conclusion there was Schlemm's sperm and Pooler's epithelial tissues found on the stick, thereby indication deliberate fabrication, and that the DNA evidence could have been planted by Pooler (*e.g.*, Pooler herself inserting the broom handle into her vagina) to falsely implicate Schlemm because she caught [] Schlemm back with his ex-girlfriend, Julie Rodriguez.

Hence, that Schlemm is the source of the DNA evidence on the Stick does [not] necessarily mean his is guilty of the offense charged. Aside from issues of intent or knowledge that have nothing to do with the DNA, there remains, for instance, the possibility that the DNA sample on the stick matched because Pooler framed [] Schlemm by putting a sample of [] Schlemm's DNA on the stick thought to have come from the crime scene *after* their *consensual* sex sessions between Pooler and Schlemm.

For independent evidence to support this allegation, Schlemm directs this Court's attention to Pooler's own testimony. Pooler admitted that she and Schlemm had consensual sex in the beginning period of September 21 to September 26, 1998 also and her testimony admitting that she caught Schlemm and Ms. Rodriguez back together, all of which shows a plausible motive to falsify against [] Schlemm and planting his DNA on the stick. All this in turn means that a reasonable Attorney would have known to investigate the state's DNA experts (Schroeder and Noll) before trial, or produce rebuttal experts of his own, in order to ascertain whether or not the DNA evidence of the state was a Trojan Horse and thus planted by Pooler to falsely implicate Schlemm. Therefore, either way, this line of defense (*i.e.*, Pooler's self-insertion of the stick) could have corroborated the defense theory that Pooler did in fact do this in order to contrive her own version of the abuse, thereby intended to show Schlemm acted in conformity wherewith during the incident at issue, facts that were suspected and available to [trial counsel].

(Pet'r's Br. at 28-29.)

Precisely how Schlemm claims that his trial counsel was ineffective for not having further DNA testing performed is not at all clear to this court. Schlemm seems to be arguing that it is possible that Pooler herself placed Schlemm's sperm on the broom handle by inserting it into her vagina so that she could frame him for criminal behavior. But, even assuming that were the case, no amount of alternative DNA testing would prove that fact. Accordingly, Schlemm has failed to

23

demonstrate how he was prejudiced by trial counsel's failure to have alternative DNA testing conducted.

*(e) Counsel's failure to obtain Kathleen's mental health records so that he could fully cross-examine her about her mental history and its effect on her ability to recall Schlemm's abuse*

Schlemm argues that his trial counsel was ineffective for not obtaining Pooler's mental health records so that he could fully cross-examine her about her mental health history and its effect on her ability to recall Schlemm's abuse. Specifically, Schlemm asserts as follows:

> [R]ecords containing information of Pooler's mental history would have served as powerful evidence to confirm that Pooler's psychological state following the September 21 to September 26, 1998 events were in reality not true, but feigned, beatings or assaults by Schlemm. Indeed, the records containing information of Pooler's mental history would be so devastating were it [sic] shown to the jury, it would be much more than impeachment, that one would have to be living in a dream world to think that records like that wouldn't influence a jury. Here, information of Pooler's mental history would have given the jury an alternative basis that the drug Zoloft Pooler was taking up to [the] time she was initially interviewed by police could have affected and influenced the manner in which she would react to questioning by the police; hence Pooler's behavior and responses to this police questioning, inability to accurately perceive and report reality, and particularly as it related to Pooler repeatedly rejecting opportunities to escape the so-called 'wrath' of Schlemm and rebuff repeated offers of help, even from law enforcement people, was not because Pooler was suffering from some battered woman syndrome, rather that Pooler was suffering from an acute psychological problem associated with overdosing on the drug Zoloft.

(Pet'r's Br. at 31-32.)

The state court of appeals addressed and rejected this claim, albeit in the context of reviewing the trial court's rejection of Schlemm's postconviction motion for discovery of Pooler's mental health records. In doing so, the court stated as follows:

> In his postconviction motion, Schlemm asserted that Kathleen was taking the prescription drug "Zoloft" at the time of the incident, and he should be able to obtain treatment records "to inquire into . . . [its] effect upon her." At trial, however, Kathleen was questioned at length about her use of both prescription and illicit drugs,

24

and trial counsel explored the potential adverse effects on Kathleen's ability to accurately recall events. Schlemm had not shown that the records contain relevant information that is not merely cumulative to other evidence in his possession. An appeal on this issue would lack arguable merit.

(Ans. Ex. P at 12.) Schlemm has not demonstrated that the state court's resolution of this claim constituted an unreasonable application of *Strickland*. Indeed, Schlemm offers nothing more than speculation as to what Pooler's mental health records might show. ("Had there been Pooler's psychological records available, [trial counsel] might well have been able to *meaningfully* explore the potential adverse effects of Pooler's ability to recall the September 21 to September 26, 1998 events." (Pet'r's Br. at 31; emphasis in original)). And the trial record does indeed reveal that Pooler's use of Zoloft, her overdose, other drug use (including cocaine and crack), use of alcohol, depression, and blackouts were all brought out during direct examination and cross-examination. In other words, Schlemm has failed to show how he was prejudiced by not receiving (or by his trial counsel's not obtaining) Pooler's mental health records.

In conclusion, and for all of the foregoing reasons, to the extent that Schlemm's petition for a writ of habeas corpus is predicated on the claim that he received ineffective assistance of counsel, his petition will be denied.

## B. Right of Self-Representation

Schlemm claims that the state trial court denied him his right to self-representation. Specifically, Schlemm asserts that on the second day of trial he informed the court that he wanted to discharge his trial counsel; indeed, he "unequivocally told the state trial court *four times* that he did not want to continue to trial with Bordow [his trial counsel]. The state trial court merely noted that Bordow was doing an 'exemplary job,' would not allow Bordow to withdraw, and noted that

Schlemm was not competent to proceed as his own counsel." (Pet'r's Br. at 36.) Schlemm argues that

> [t]he United States Supreme Court says that the Sixth Amendment of the United States Constitution guarantees a defendant in a criminal prosecution the right to proceed *pro se*. When a defendant seeks to proceed *pro se*, the trial court is to ensure that the defendant: (1) has knowingly, intelligently and voluntarily waived the right to counsel; and (2) that the defendant is competent to proceed *pro se*. *Godinez v. Moran*, 509 U.S. 389, 396 (1993). Thus, *Godinez* requires trial courts to conduct a colloquy with a defendant requesting to proceed *pro se* to establish waiver of counsel *and* competency. Here, it was the state trial court's *obligation* to conduct such a colloquy and Bordow's *duty* to alert the state trial court to these colloquy requirements.
>
> . . .
>
> [T]he state trial court was well aware of the conflict between Schlemm and Bordow during the trial. Had the state trial court performed the mandated colloquies, it would have found that Schlemm was willing to proceed *pro se* knowingly; that he was competent to represent himself, and that there was no dilatory or tactical advantage to his request. Accordingly, Schlemm had a constitutional right to represent himself and that right was unreasonably denied.

(Pet'r's Br. at 36-38.)

The respondent has a multi-fold response to Schlemm's claim. First, the respondent argues that this particular claim was procedurally defaulted by Schlemm. Next, the respondent argues that, even assuming this claim was not procedurally defaulted, it should be denied because "the United States Constitution and *Godinez* do not require any specific colloquy when the defendant seeks to waive counsel." (Resp.'s Br. at 27.) (citing *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)). Moreover, the claim should be denied because "Schlemm never unequivocally indicated that he wanted to proceed *pro se*." (Resp's Br. at 27- 28.) In this latter regard,

> [a]lthough Schlemm told the court that he wanted to fire Bordow, expressed dissatisfaction with his performance, and said that he did not want to continue the trial with him, Schlemm never told the court that he wanted to represent himself.

26

Instead, when the court reminded Schlemm that it had been forced to appoint counsel for Schlemm because he had asked several public defenders to withdraw and did not want to waive his right to counsel, Schlemm told the court that it was not his fault and demanded that he be given "effective" counsel. If anything, Schlemm was demanding new counsel to finish the trial, not to represent himself. Schlemm cannot claim that the trial court improperly denied him his right to self-representation when he never clearly requested that he be allowed to do so. *See United States v. Johnson*, 223 F.3d 665, 668 (7th Cir. 2000) ("[f]ailure to assert the right of self-representation waives it without regard to the intentions of the defendant in not asserting it").

(Resp's Br. at 28-29.)

Finally, the respondent argues that "even if Schlemm would have indicated that he wanted to proceed *pro se* at the time in question, the trial court was under no obligation to allow him to do so because his request was too late. "A person accused of a crime has an absolute right, under the Sixth Amendment, to represent himself only if he asserts that right before trial." *Brooks v. McCaughtry*, 380 F.3d 1009, 1011 (7th Cir. 2004) (internal quotations omitted).

Regardless of whether or not Schlemm procedurally defaulted this particular claim, the simple fact is that the trial court did not violate Schlemm's Sixth Amendment right to self-representation. Thus, this claim cannot support Schlemm's prayer for federal habeas corpus relief.

Schlemm cites *Godinez v. Moran*, 509 U.S. 396 (1993) for the proposition that trial courts are required "to conduct a colloquy with a defendant requesting to proceed *pro se* to establish waiver of counsel *and* competency." (Pet'r's Br. at 36.) To be sure, the court in *Godinez* stated, *inter alia*, that "[i]n addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez*, 509 U.S. at 400. But, *Godinez* does not stand for the proposition that a trial court must conduct such a colloquy with a criminal defendant on the second day of the defendant's trial and thereafter grant his request to have his lawyer fired (as Schlemm here requested). Indeed,

27

while it might be said that a criminal defendant has a constitutional right under the Sixth Amendment to counsel and an equal and opposite right to proceed without counsel, *see Faretta v. California*, 422 U.S. 806, 814-15 (1975), it must also be said that such criminal defendant "'has [such] absolute right . . . to represent himself only if he asserts that right before trial.'" *Brooks*, 380 F.3d at 1011 (quoting *United States v. Washington*, 353 F. 3d 42, 46 (D.C. Cir. 2004). Given the foregoing, it follows that Schlemm's claim that he was deprived of his right of self-representation must be denied.

In conclusion, and for all of the foregoing reasons, Schlemm's petition for a writ of habeas corpus will be denied and this action will be dismissed.

## VI. ORDERS

**NOW THEREFORE IT IS ORDERED** that Schlemm's petition for a writ of habeas corpus be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this <u>19th</u> day of July 2007, at Milwaukee, Wisconsin.


<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

28